# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### No. 5:23-CV-331-D

MATTHEW MANNING,                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )               **ORDER**
                                        )
NORTH CAROLINA STATE UNIVERISTY,        )
et al.,                                 )
                                        )
                    Defendants.

On June 19, 2023, Matthew Manning ("Manning" or "plaintiff") filed this action against North Carolina State University ("State") [D.E. 1]. On August 25, 2023, State moved to dismiss Manning's complaint [D.E. 9] and filed a memorandum in support [D.E. 10]. See Fed. R. Civ. P. 12(b)(1), (6). On October 10, 2023, Manning filed an amended complaint [D.E. 12] adding Yaroslava Yingling ("Yingling") as a defendant (collectively with State, "defendants"). In Manning's amended complaint, Manning alleges (1) discrimination in violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., ("Title I") and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq., ("section 504"), (2) retaliation in violation of Title I of the ADA and section 504, (3) hostile work environment in violation of Title I of the ADA and section 504, (4) disability discrimination in violation of Title II of the ADA, 29 U.S.C. § 12132, ("Title II"), (5) disability discrimination in violation of section 504, (6) retaliation in violation of section 504, and (7) tortious interference with contract (against Yingling only). On November 14, 2023, defendants moved to dismiss the amended complaint [D.E. 19] and filed a memorandum in support [D.E. 20]. See Fed. R. Civ. P. 12(b)(1), (6). On December 19, 2023, Manning responded

in opposition [D.E. 22]. On January 16, 2024, defendants replied [D.E. 23]. As explained below, the court grants defendants' motion to dismiss for failure to state a claim upon which relief may be granted.

I.

Manning has "severe and chronic" Attention Deficit Hyperactivity Disorder ("ADHD"), Major Depressive Disorder, and Generalized Anxiety Disorder. Am. Compl. [D.E. 12] ¶ 29. Manning experiences excessive worry, rumination, avoidance behaviors, perfectionism, insomnia, fatigue, low self-esteem, apathy, sadness, irritability, and poor motivation as a result. See id. at ¶ 30.

In fall 2016, Manning enrolled at State as a doctoral candidate in the materials science and engineering program. See id. at ¶ 26. To graduate, a doctoral candidate must earn 72 credit hours, including nine hours of materials science and engineering upper-level courses, 18 credit hours of other upper-level courses, and 45 credit hours of doctoral supervised research, teaching, and doctoral dissertation research, and complete a dissertation. See id. at ¶¶ 26–27. The program typically takes six academic years. See id. at ¶ 27.

Doctoral candidates may serve as graduate teaching assistants ("GTA") or graduate research assistants ("GRA"). GTAs serve as instructors of record, lab instructors, recitation leaders, lab assistants, or lecture assistants, support classroom instruction, and provide general teaching support. See id. at ¶ 31. GRAs conduct research and provide general research support. See id. at ¶ 26. GRA work may contribute to a student's dissertation. See id.

From May 16, 2017, to August 16, 2018, and August 1, 2020, to December 22, 2020, Manning served as a GRA and earned an annual salary of $15,000 for 15 hours of work per week.

2

See id. at ¶ 33.  In fall 2017, Manning served as a GRA under Yingling's supervision.  See id. at ¶ 36.

In fall 2019, Manning was hospitalized twice for depression.  See id. at ¶ 37.  In fall 2020, Manning's severe depression began interfering with his doctoral work and studies.  See id. at ¶ 38. Consequently, Manning requested and received a leave of absence for fall 2020 through spring 2021.  See id. at ¶ 39.  Before returning to school, Manning's psychiatrist provided suggested accommodations to allow Manning to finish his degree.  See id. at ¶ 40.

In fall 2021, Manning returned to school and work.  From August 16, 2021, through May 15, 2022, Manning served as a GTA under Yingling's supervision and earned an annual salary of $25,000 for 20 hours of work per week.  See id. at ¶ 41.  When Manning returned to school and work in fall 2021, Yingling treated him differently.  See id. at ¶ 43.  Yingling told Manning that she needed to "push him" to help him become a better researcher and better doctoral student.  Id. at ¶ 53.  She criticized his work without constructive criticism and did not appoint him to a GRA position because there were no available funds.  See id. at ¶¶ 43–44.  Additionally, Yingling called Manning on his cell phone outside of business hours and required that he immediately respond to student inquiries.  See id. at ¶ 49.

In September 2021, Manning requested accommodations from State's Disability Resources Office.  See id. at ¶ 45.  In October 2021, Manning spoke with Dean Peter Harries ("Harries") concerning Yingling's treatment and requirement that Manning post his appointments, including medical appointments, on a public, shared calendar of doctoral candidates and faculty.  See id. at ¶ 47.  On October 4, 2021, Manning discussed his disabilities with Yingling, and she said that she also had "mental health issues."  Id. at ¶ 48.  On October 10, 2021, Manning requested accommodations from the Office of Institutional Equity and Diversity ("OIED").  See id. at ¶ 51.

On October 12, 2021, Manning filed a discrimination report against Yingling with the OIED alleging harassment, unrealistic expectations, and adding unnecessary stress to Manning's job. See id. at ¶ 52. On October 15, 2021, Dave Johnson ("Johnson") in State's Equal Opportunity and Equity Office told Manning that no actions would be taken against Yingling. See id. at ¶ 54. Harries told Johnson to complete his degree or drop out. See id. at ¶ 55. On October 17, 2021, Manning again requested accommodations from the Disability Resources Office. See id. at ¶¶ 45, 56.

On October 18, 2021, Manning asked Yingling for a spring 2022 GRA position. See id. at ¶ 57. A GRA position Manning wanted became available, but Yingling chose a first-year graduate student for the position. See id. Yingling told Manning that he could not have the GRA job because he was a "liability." See id. Manning found a different GRA position for the spring, though it paid less than his desired position. See id. at ¶¶ 58, 61.

On January 11, 2022, Claude Reynolds, Jr. ("Reynolds") became Manning's supervisor. See id. at ¶ 60. In the spring, Yingling did not select Manning for the Materials Research Society Convention. See id. at ¶ 59.

On January 28, 2022, Manning met with April Baer ("Baer") in the Office of Institutional Equity and Diversity to request accommodations. See id. at ¶ 62. Baer denied Manning's requested accommodations and instead assigned Manning a private office. See id. at ¶¶ 62–63.

On April 11, 2022, Manning filed a charge of discrimination with the Equal Opportunity Commission ("EEOC"). See id. at ¶ 19. On April 13, 2022, the OIED denied Manning's requested accommodations and offered a list of alternative accommodations. See id. at ¶¶ 51, 64. "The list provided the following options: 1) 'Adjust your work schedule to be in alignment when the department's breakroom is available and you are more likely to engage with other members of

4

your department/college within the building;' 2) 'Use a cooler for safe food storage when you are unable to access your department's breakroom; and/or' 3) 'Work from a remote location which best meets your needs.'" Id. at ¶ 64. Manning decided that the proposed accommodations did not address his disabilities. See id.

In June 2022, Manning's GRA position ended. See id. at ¶ 65. He could not find another GRA or GTA position. See id. At some point, Reynolds withdrew as Manning's supervisor. See id. at ¶ 60. With no advisor or supervisor, Manning did not know how to proceed with his doctoral program. See id. at ¶¶ 60, 66. Accordingly, Manning took another leave of absence. See id. at ¶¶ 66, 67.

On March 21, 2023, the EEOC issued a right to sue notice. See id. at ¶ 20. On June 19, 2023, Manning filed suit. See [D.E. 1]. Manning seeks back pay, front pay, compensatory damages, punitive damages, and costs. See Am. Compl. 24–25.

## II.

### A.

Before addressing the merits, the court resolves various procedural issues. On August 25, 2023, State filed a motion to dismiss Manning's complaint. See [D.E. 9]. On October 10, 2023, Manning amended his complaint, adding Yingling as a party. See [D.E. 12, 13]. Accordingly, the court dismisses as moot State's motion to dismiss Manning's complaint.

### B.

Defendants contend that some allegations in Manning's Title I ADA claims are unexhausted or time-barred. See [D.E. 20] 6–8. The ADA incorporates the administrative enforcement provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), including the requirement that a plaintiff exhaust his administrative remedies by filing a charge with the EEOC

5

concerning the alleged discrimination before filing suit in federal court. See 42 U.S.C. §§ 2000e-5(e)(1), 12117(a); Sydnor v. Fairfax Cnty., 681 F.3d 591, 593 (4th Cir. 2012); Williams v. N.C. Admin. Off. of the Cts., 364 F. Supp. 3d 596, 601 (E.D.N.C. 2018); Thiessen v. Stewart-Haas Racing, LLC, 311 F. Supp. 3d 739, 743 (E.D.N.C. 2018). The requirement to file a charge with the EEOC serves "two principal purposes." Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 407 (4th Cir. 2013). "First, it notifies the charged party of the asserted violation." Id. (quotation omitted). Second, "it brings the charged party before the EEOC and permits effectuation of the [ADA]'s primary goal, the securing of voluntary compliance with the law." Id. (quotation omitted).

Manning had to file an EEOC charge within 180 days of each alleged discrete act of discrimination under Title I of the ADA. See 42 U.S.C. §§ 2000e-5(e)(l), 12117(a). The 180-day time requirement is not jurisdictional and is subject to waiver, estoppel, and equitable tolling. See Zipes v. Trans World Airlines. Inc., 455 U.S. 385, 393 (1982). Although the timeliness of administrative exhaustion is not jurisdictional, the failure to file an EEOC charge at all concerning the alleged discrimination can bar an ADA claim. See Fort Bend Cnty. v. Davis, 139 S. Ct. 1843, 1850–52 (2019). Such a failure results in loss of an "actionable" claim and "the ability to recover." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 113 (2002), superseded by statute on other grounds, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5; Davis, 139 S. Ct. at 1851–52. Moreover, "only incidents that took place within the timely filing period are actionable." Morgan, 536 U.S. at 114; see Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 623–24 (2007), superseded by statute on other grounds, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5; Hentosh v. Old Dominion Univ., 767 F.3d 413, 417 (4th Cir. 2014),

6

abrogated on other grounds by Davis, 139 S. Ct. 1843 (2019); Cooper v. Smithfield Packing Inc., No. 5:10-CV-479, 2011 WL 3207912, at *3 (E.D.N.C. July 27, 2011) (unpublished).

On April 11, 2022, Manning filed his EEOC charge. See Am. Compl. ¶ 19. Manning concedes that only discrete acts of discrimination that occurred on or after October 13, 2021, are actionable under Title I of the ADA. See [D.E. 22] 14; [D.E. 23] 3. Thus, the court dismisses any claim under Title I of the ADA concerning a discrete act of discrimination that occurred before October 13, 2021.

As for Manning's ADA Title I hostile work environment claim, "a court sometimes may consider events beyond the 180-day charge-filing period when analyzing a hostile work environment claim." McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 616 (E.D.N.C. 2006); see Morgan, 536 U.S. at 115–21. A "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" Morgan, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e–5(e)(1)). For purposes of requirement that a person file a charge within 180 days after the alleged "unlawful employment practice," so long as a single act "contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered" for the purposes of determining liability. Id. Thus, a court must examine whether the "pre-and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Id. at 120 (quotation omitted).

Defendants argue that Manning has not stated a hostile work environment claim but do not dispute that the alleged conduct could constitute a single act for a hostile work environment analysis. See [D.E. 23] 3 n.2; cf. Am. Compl. ¶¶ 43–52, 64–65. Accordingly, Manning's hostile work environment claim is not time-barred.

Defendants also argue that the applicable statute of limitations bars Manning's claims under Title II of the ADA and Section 504. See [D.E. 20] 8–9. Congress has not adopted a specific statute of limitations for actions under Title II of the ADA and Section 504. See McCullough v. Branch Banking & Tr. Co., 35 F.3d 127, 129 (4th Cir. 1994); Green v. Café, No. 4:04-CV-111, 2008 WL 7871053, at *5 (E.D.N.C. Nov. 5, 2008) (unpublished), aff'd sub nom. Green v. Maroules, 328 F. App'x 868 (4th Cir. 2009) (per curiam) (unpublished). North Carolina's most analogous statute to Title II of the ADA and Section 504 is the Persons with Disabilities Protection Act ("PDPA"), N.C. Gen. Stat. § 168A. See McCullough, 35 F.3d at 132; Green, 2008 WL 7871053, at *5; Stroud v. Harrison, 131 N.C. App. 480, 486, 508 S.E.2d 527, 530 (1998). The PDPA "specifically addresses employment discrimination on the basis of handicap or disability" and other complaints of discrimination. McCullough, 35 F.3d at 130; see A Soc'y Without a Name v. Virginia, 655 F.3d 342, 347–48 (4th Cir. 2011); Wolsky v. Med. Coll. of Hampton Rds., 1 F.3d 222, 223 (4th Cir. 1993); J.W. v. Johnston Cnty. Bd. of Educ., No. 5:11-CV-707, 2012 WL 4425439, at *6–7 (E.D.N.C. Sept. 24, 2012) (unpublished). The PDPA provides a 180-day statute of limitations for employment-related claims and a two-year statute of limitations for non-employment-related claims. See N.C. Gen. Stat. § 168A–12.

Although the limitations periods for claims brought under Title II of the ADA and Section 504 are borrowed from state law, federal law determines the time for accrual. See A Soc'y Without a Name, 655 F.3d at 348; Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). A claim accrues when the plaintiff knows or has reason to know of the injury forming the basis of an action. See A Soc'y Without a Name, 655 F.3d at 348; Cox, 529 F.2d at 50.

As for the timeliness of Manning's section 504 retaliation claims, Manning's section 504 employment-related claim in count two is time-barred, and the court dismisses this claim. See

8

N.C. Gen. Stat § 168A–12. Manning's ADA Title II and section 504 academic-related claims are not time-barred.

## III.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

9

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d, 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

North Carolina law applies to some claims in this case. For those claims, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). First, the court looks to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). "If there are no governing opinions from that court, this court may consider the opinions of North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks ex. rel. Feiock v. Feiock, 485 U.S. 624, 630 & n.8 (1988).

10

Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

A.

In count one, Manning alleges Title I disparate treatment and failure-to-accommodate claims against State and Yingling. See id. at ¶¶ 68–82. Title I of the ADA applies to employment and prevents discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

A plaintiff may assert a Title I ADA claim against his employer based on (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. See Raytheon Co. v. Hernandez, 540 U.S. 44, 52–53 (2003); Prentice v. North Carolina, No. 5:20-CT-3150, 2023 WL 2533164, at *4 (E.D.N.C. Mar. 3, 2023) (unpublished), aff'd sub nom. Prentice v. Haynes, No. 23-6243, 2023 WL 6442566 (4th Cir. Oct. 3, 2023) (per curiam) (unpublished); see also A Helping Hand, LLC v. Balt. Cnty., 515 F.3d 356, 362 (4th Cir. 2008). A plaintiff may prove such discrimination through direct evidence or through the McDonnell Douglas burden-shifting framework. See Raytheon, 540 U.S. at 49–50 & n.3; Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973).

i.

A shareholder, officer, supervisor, or co-worker of a corporate "employer" (as defined in the ADA) cannot be held individually liable for an alleged Title I ADA violation. The definition of "employer" under the ADA does not encompass such person in her individual capacity. See 42 U.S.C. §§ 12111(5)(A), 12111(7); Baird ex rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999); Pelela v. Mike & Katy's Causeway Cafe, Inc., No. 7:05-CV-196, 2006 WL 8439080, at *1 (E.D.N.C. Jan. 27, 2006) (unpublished). Accordingly, the court dismisses Manning's Title I ADA claims against Yingling.

ii.

Even though a plaintiff need not plead a prima facie case to survive a motion to dismiss,[1] Swierkiewicz "left untouched the burden of a plaintiff to allege facts sufficient to state all the elements of [his] claim." Jordan v. Alt. Res. Corp., 458 F.3d 332, 346 (4th Cir. 2006) (cleaned up), overruled on other grounds by Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264 (4th Cir. 2015) (en banc); see Iqbal, 556 U.S. at 678–79; Twombly, 550 U.S. at 569–70; McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015). In order to state a discrimination claim under Title I of the ADA, Manning must plausibly allege that State violated Title I of the ADA.

To establish a disability discrimination claim under Title I of the ADA, a plaintiff must prove "(1) that [he] has a disability, (2) that [he] is a 'qualified individual' for the employment in question, and (3) that [his] employer discharged [him] (or took other adverse employment action) because of [his] disability." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 572 (4th Cir. 2015) (quotation omitted); see EEOC v. McLeod Health, Inc., 914 F.3d 876, 883 (4th Cir. 2019). A disability under the ADA must "substantially limit[] one or more [of the plaintiff's] major life

---

[1] See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510–15 (2002).

activities." 42 U.S.C. § 12102(1)(A); see J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019); Jacobs, 780 F.3d at 572–74. An adverse action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see Laird v. Fairfax Cnty., 978 F.3d 887, 893 (4th Cir. 2020).

Direct evidence requires "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." Rhoads v. F.D.I.C., 257 F.3d 373, 391–92 (4th Cir. 2001) (quotation omitted); see Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–80 (2009); Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999), abrogated on other grounds by Desert Palace v. Costa, 539 U.S. 90 (2003); EEOC v. Mfrs. & Traders Tr. Co., 429 F. Supp. 3d 89, 118–19 (D. Md. 2019).

Manning alleges that "Yingling admitted funding was available[,] but she would not appoint [Manning] to [a GRA] position because she considered him a 'liability.'" Am. Compl. ¶ 75. Manning argues that Yingling's statement constitutes direct evidence of disability discrimination. See id. at ¶ 72. This statement, however, does not "reflect directly the alleged discriminatory attitude." Warch, 435 F.3d at 520 (quotation omitted). Accordingly, the statement does not constitute direct evidence of discriminatory animus, and the court evaluates Manning's Title I claim under McDonnell Douglas.

As for Manning's prima facie case, Manning alleges he has "[m]ajor [r]ecurrent [d]epressive [d]isorder" that resulted in "severe depression," caused two hospitalizations, and "interfere[d] with [Manning's] doctoral work and studies." Am. Comp. ¶¶ 37–38, 69. Manning

13

also alleges that his depression interfered with his work by limiting "his ability to concentrate, think, work, and communicate under certain circumstances." Id. at ¶ 70. Accordingly, Manning plausibly alleges a disability.

Manning alleges that he was qualified to perform his job and performed the essential functions of his job without reasonable accommodation, including completing a GRA position and co-authoring three publications. See id. at ¶ 71. The court assumes without deciding that Manning has plausibly alleged that he was qualified.

Manning alleges that he was treated differently than his non-disabled classmates when Yingling required him to "post his medical appointments on a public, shared calendar," repeatedly called Manning "on his cell phone outside of business hours and demand[ed] that he answer student inquiries immediately," and removed "him as a co-author" from one publication. Id. at ¶¶ 47, 85, 107. Manning's amended complaint, however, does not allege that he had to disclose the specific nature of his medical appointments. A supervisor asking an employee to provide availability on a shared calendar and respond to calls and inquiries outside of normal business hours does not violate the ADA. Furthermore, Manning simply states that Yingling removed him as a co-author of a publication but does not allege a reason for removal, if she replaced him, or any other facts that plausibly allege disability discrimination. Thus, these actions do not constitute disability discrimination.

As for Yingling's alleged refusal to "appoint [Manning] to a GRA position" and to require him to take a lower-paying GTA position, id. at ¶ 72, from May 16, 2017, to August 16, 2018, and August 1, 2020, to December 22, 2020, Manning served as a GRA making $15,000 per year for 15 hours of work per week. See id. at ¶¶ 33, 36. On August 16, 2021, following Manning's return to State, Manning served as a GTA making $25,000 per year for 20 hours of work per week. See

14

id. at ¶ 41. Manning alleges that Yingling refused to appoint him to a GRA position because there was no funding for his previous GRA position and because of his disabilities. See id. at ¶¶ 43–44. Manning also alleges that work performed as a GRA is essential to his dissertation and to graduating. See id. at ¶ 34. Furthermore, Manning alleges that Yingling hired a less qualified first-year graduate student for an open GRA position that Manning wanted. See id. at ¶ 57.

From fall 2020 through spring 2021, Manning chose to take a leave of absence from State. See id. at ¶ 39. He does not allege that State promised him a GRA position upon return. He also does not allege that State guarantees a GRA position to every doctoral candidate in his program. Manning recognizes that a GRA position makes it easier to research his dissertation topic but is not necessary to graduate. See id. at ¶¶ 32, 44. He also acknowledges that a GRA and GTA position have different responsibilities but does not allege that one position is better or has more responsibility than the other. See id. at ¶¶ 31–32. Moreover, the court rejects the inference that Manning's years in a program automatically means Manning was more qualified than a first-year doctoral candidate. See id. at ¶¶ 57, 75. Furthermore, although Manning is upset that he could earn more money in his preferred GRA position, he made more money in the GTA position than his pre-leave of absence GRA position. See id. at ¶¶ 33, 41; cf. Ellerth, 524 U.S. at 761; Laird, 978 F.3d at 894–95. Accordingly, even viewing Manning's amended complaint in the light most favorable to Manning, Manning fails to plausibly allege an ADA Title I discrimination claim, and the court dismisses the claim.

iii.

Under the ADA, unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee . . . ." 42 U.S.C. § 12112(b)(5)(A). "[R]easonable

15

accommodation[s]" may include "job restructuring [or] reassignment to a vacant position . . . ." Id. § 12111(9)(B).

Manning lacks direct evidence of disability discrimination. To establish a prima facie case for a failure-to-accommodate claim, a plaintiff must prove: (1) he has a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) with a reasonable accommodation, he could perform the essential functions of the position; and (4) the employer refused to make such an accommodation. See, e.g., Cowgill v. First Data Techs., Inc., 41 F.4th 370, 378 (4th Cir. 2022); Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). A plaintiff's failure to prove any element of his prima facie case defeats his ADA failure-to-accommodate claim. See Wilson, 717 F.3d at 345; see also EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 131–32 (1st Cir. 2014).

Courts analyzing an ADA failure-to-accommodate claim generally focus on whether, with a reasonable accommodation, an employee with a disability can perform the essential functions of a given job. See, e.g., Jacobs, 780 F.3d at 579–80. The failure-to-accommodate inquiry generally proceeds in two steps: (1) whether the specific accommodation that the disabled employee requested was reasonable and (2) if the employer granted the reasonable accommodation, whether the disabled employee could perform the essential functions of the job. See id. at 580–81. A reasonable accommodation "is connected to what the employer knows about the specific limitations affecting an employee who is a qualified individual with a disability." Jackson v. City of Chi., 414 F.3d 806, 813 (7th Cir. 2005) (emphasis added); see Allen v. City of Raleigh, 140 F. Supp. 3d 470, 483 (E.D.N.C. 2015); 42 U.S.C. § 12112(b)(5)(A). Accordingly, the ADA contemplates an open, interactive process between the employer and employee to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that

16

could overcome the limitations." 29 C.F.R. § 1630.2(o)(3); see Kohl's Dep't Stores, Inc., 774 F.3d at 132; Wilson, 717 F.3d at 346–47; Hoppe v. Lewis Univ., 692 F.3d 833, 840–41 (7th Cir. 2012); Griffin v. United Parcel Serv., Inc., 661 F.3d 216, 224 (5th Cir. 2011).

Plaintiff bears the burden of demonstrating that he "could perform the essential functions of [his] job with reasonable accommodation." Tyndall v. Nat'l Educ. Ctr.'s, Inc., 31 F.3d 209, 213 (4th Cir. 1994). Furthermore, "the phrase 'reasonable accommodation' does not mean that an employee gets whatever position [or accommodation] [he] desires." Williams v. Brunswick Cnty. Bd. of Educ., 725 F. Supp. 2d 538, 549 (E.D.N.C. 2010), aff'd, 440 F. App'x 169 (4th Cir. 2011) (per curiam) (unpublished); see, e.g., US Airways, Inc. v. Barnett, 535 U.S. 391, 396–406 (2002). Furthermore, an accommodation is unreasonable "if it requires elimination of an essential duty." Champ v. Baltimore Cnty., 884 F. Supp. 991, 999 (D. Md. 1995), aff'd, 91 F.3d 129 (4th Cir. 1996) (per curiam).

"The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Kohl's Dep't Stores, Inc., 774 F.3d at 132. The interactive process requires bilateral cooperation, open communication, and good faith. See id. "If an employer engages in the interactive process with the employee in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for failure to provide reasonable accommodations." Id.; see EEOC v. Agro Distrib., LLC, 555 F.3d 462, 472 (5th Cir. 2009); Jackson, 414 F.3d at 813–14. An employer need not provide a reasonable accommodation if accommodating the employee would create an "undue hardship." See 42 U.S.C. 12112(b)(5)(A).

17

Manning plausibly alleged he has a disability. See Am. Comp. ¶¶ 37–38, 69–70. Moreover, in July 2021, Manning put State on notice of his disabilities when his psychiatrist told State about Manning's "chronic diagnoses and recommend[ed] disability accommodations for him." Id. at ¶ 40. Furthermore, on October 4, 2021, Manning placed Yingling on notice during a one one-on-one meeting. See id. at ¶¶ 48, 50.

As for a reasonable accommodation, on October 10, 2021, Manning requested the following accommodations:  not contacting him on his personal cell phone, limiting communications with him to business hours, providing him exemplars of graded assignments from previous semesters, and providing him a solution key and grading rubric for assignments. See id. at ¶ 51. On October 17, 2021, Manning again requested these accommodations. See id. at ¶ 56.

Students' schedules at universities are not 9:00 AM to 5:00 PM jobs.  Students and professors must work around classes, research, and mandatory university requirements, particularly when an essential job function is "support[ing] the teaching mission of the department." Id. at ¶ 31. Moreover, Manning does not plausibly allege that his requested accommodations are connected to what State knew about Manning's specific limitations or that he would be able to attain an equal level of achievement as a non-disabled person with the requested accommodations. See Jackson, 414 F.3d at 813. Thus, Manning has not met his burden of plausibly alleging that his requested accommodations are reasonable.

Alternatively, even if the court assumes without deciding that the requested accommodations are reasonable, Manning failed to cooperate in the interactive process.  On January 28, 2022, Manning met with the appropriate representatives from State to discuss potential accommodations. See Am. Compl. ¶ 62. On April 13, 2022, State denied Manning's proposed accommodations but provided a list of its proposed accommodations including:  (1) adjusting

18

Manning's work schedule to reflect when the breakroom is open and engagement with other departmental members is more likely, (2) using a cooler for safe food storage when the breakroom is closed, and (3) working remotely. See id. at ¶ 64. In response, Manning conclusorily alleges that "[n]one of the listed accommodations addressed any of [Manning's] disabilities." Id. Manning, however, does not allege that he explained why the proposed accommodations did not address his alleged disabilities. Thus, even viewing Manning's amended complaint in the light most favorable to Manning, Manning did not cooperate in the interactive process. Accordingly, Manning's Title I failure-to-accommodate claim fails, and the court dismisses it.

## B.

In count three, Manning alleges that State through Yingling created a hostile work environment in violation of the ADA. See id. at ¶¶ 90–101. To state a hostile work environment claim under the ADA, Manning must plausibly allege:

> (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.

Fox v. Gen. Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001); accord EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010) (Title VII); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008) (Title VII); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc) (Title VII). An employee must show that his protected characteristic under the ADA was the "but for" cause of the alleged harassment. See, e.g., Gentry v. East West Partners Club Mgt. Co., 816 F.3d 228, 234–36 (4th Cir. 2016); Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134, 142 (4th Cir. 2007). "[C]onclusory statements that [an employer] treated [the plaintiff] less favorably than"

other employees of "similar rank" who lacked the relevant protected characteristic "cannot support an actionable claim for harassment." Causey v. Balog, 162 F.3d 795, 801–02 (4th Cir. 1998).

To determine whether alleged harassment was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and to create an abusive working environment, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the harassment to be sufficiently severe or pervasive as to alter his conditions of employment. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto, 786 F.3d at 277. Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

The objective component helps courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). The court considers the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The conduct must be extreme to be actionable. See Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. The ADA does not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80. The "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–81. "[D]iscriminatory intimidation, ridicule, and insult" based on the protected characteristic must

"permeate[ ]" the work environment in a manner "sufficiently severe or pervasive to alter the conditions" of the plaintiff's employment and to "create an abusive working environment." Harris, 510 U.S. at 21 (quotations omitted). Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006), abrogated in part on other grounds by Gross, 557 U.S. at 177–80; see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82.

The court assumes without deciding that Manning plausibly alleged he has a disability, that Yingling's "comments, harassment, and hostility" were unwelcome, that the alleged harassment was because of Manning's disability, and that Manning subjectively believed that the alleged harassment altered a term, condition, or privilege of employment. See Am. Comp. ¶¶ 37–38, 43, 69–70, 91, 94–95.

As for whether the harassment was objectively sufficiently severe or pervasive, Manning alleges that Yingling mocked him, refused to help him improve his work, criticized his work, told him that he was a "risk" and a "liability," told Manning she also had mental health issues, and made Manning post his appointments, including medical appointments, on a shared calendar. See id. at ¶ 92. Even viewing Yingling's alleged behavior in the light most favorable to Manning, Manning has failed to plausibly allege behavior that is objectively severe or pervasive enough to alter Manning's term, condition, or privilege of employment. See, e.g., White, 548 U.S. at 68–69;

Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; Baqir, 434 F.3d at 746–47. Accordingly, the court dismisses Manning's hostile work environment claim.

C.

In count four and five, Manning alleges Title II ADA disparate treatment and failure-to-accommodate claims against State in his student capacity. See Am. Compl. ¶¶ 102–119. Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132; see Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 419–21 (4th Cir. 2015).

"Title II unambiguously does not provide a vehicle for public employment discrimination claims." Reyazuddin, 789 F.3d at 421; see Boone v. Bd. of Governors of Univ. of N.C., 858 F. App'x 622, 622 (4th Cir. 2021) (per curiam) (unpublished). Accordingly, the court dismisses Manning's employment-related allegations in counts four and five and proceeds only on Manning's academic-related allegations in count four and five.

Title II of the ADA applies to educational claims against universities. See, e.g., Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 484 (4th Cir. 2005). To state a claim under Title II of the ADA, a plaintiff must plausibly allege that: (1) he has a disability; (2) he is otherwise qualified for the benefits of a public service, program, or activity; and (3) he was excluded from participation in or denied the benefits of such service on the basis of his disability. See, e.g., Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012); Constantine, 411 F.3d at 498; Baird, 192 F.3d at 467; Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264–65 (4th Cir. 1995). To show that a plaintiff has a disability, "[h]e must prove (1) that he has a physical or mental impairment, (2) that this impairment implicates at least one major

22

life activity, and (3) that the limitation is substantial." Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 254 (4th Cir. 2006); see 42 U.S.C. § 12102(1)(A). A plaintiff may assert a violation of Title II of the ADA based on "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." A Helping Hand, 515 F.3d at 362 (quotation omitted).

Manning plausibly alleged he has a disability. See Am. Comp. ¶¶ 37–38, 69–70. Manning also plausibly alleges that he was admitted to State and was not on academic probation. See id. at ¶ 26. Manning, however, has not plausibly alleged that State excluded him from participation in the benefits of his education based on his disability. Rather, Manning chose to take a leave of absence when he could not secure another GRA or GTA position at State, but these positions were not required to graduate. See id. at ¶¶ 27–28, 65–67. Manning simply viewed them as necessary to "adequately progress." Id. at ¶ 66. In fact, Manning remains in the graduate program. See id. at ¶ 67.

As for disparate treatment as a student under Title II of the ADA, Manning alleges that he was required to share his calendar availability and that Yingling mocked and rebuked him. See id. at ¶¶ 107–08. Sharing availability on a calendar, however, as all graduate students and faculty must do, does not violate the ADA. Furthermore, Manning does not plausibly allege that State excluded him or denied him benefits on the basis of his alleged disability. Accordingly, the court dismisses Manning's Title II disparate treatment claim.

As for Manning's failure to accommodate claim under Title II of the ADA, Manning fails to plausibly allege a failure to accommodate. In July 2021, Manning's psychiatrist recommended accommodations to State to allow Manning to finish his degree. See id. at ¶ 40. Specifically, the psychiatrist recommended extended time for assignments and exams, course adjustments for

Case 5:23-cv-00331-D-BM    Document 24    Filed 03/19/24    Page 23 of 28

absences due to illness or to attend appointments concerning his illness, priority registration to allow for flexibility around his doctor appointments, and testing space with reduced distractions. See id. In September 2021, Manning formally requested accommodations. See id. at ¶ 45.

At bottom, Manning does not allege that State refused to provide the accommodations he requested. See id. at ¶¶ 102–19. Rather, Manning alleges that he met with Baer to discuss potential accommodations for his disabilities and used this meeting to seek to avoid Yingling, not to accommodate his disabilities. See id. at ¶¶ 60–64. Even viewing the amended complaint in the light most favorable to Manning, Manning's Title II failure-to-accommodate claim fails, and the court dismisses counts four and five.

## D.

In count six, Manning alleges retaliation in violation of Title II of the ADA against State in his student capacity. See id. at ¶¶ 120–25. The ADA's retaliation provision makes it unlawful to "discriminate against any individual because such individual" engaged in protected activity under the ADA. 42 U.S.C. § 12203(a); see Reynolds, 701 F.3d at 154. To state a retaliation claim under Title II of the ADA, a plaintiff must allege that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds, 701 F.3d at 154; see White, 548 U.S. at 67–70; A Soc'y Without a Name, 655 F.3d at 350; Ollis v. Hawkins, No. 5:18-CT-3276, 2020 WL 618835, at *2 (E.D.N.C. Feb. 10, 2020) (unpublished).

As for protected activity, on October 12, 2021, Manning filed a harassment complaint with State. See id. at ¶ 52. On October 15, 2021, Manning complained to Harries. See id. at ¶ 55. The court assumes without deciding that these acts constitute protected activity under the ADA.

As for adverse action and causation, Manning alleges that Yingling "ostracized" him from the doctoral program by excluding him from a funded research trip to the Materials Research Society Convention. See id. at ¶ 59. Manning fails to allege, however, the requirements for attending the convention or allege that he was the only GRA or GTA who was excluded. Thus, Manning does not causally link these decisions to his protected conduct.

Manning also alleges that on January 11, 2022, after Manning complained about Yingling's performance as his supervisor, State assigned him to a new supervisor (i.e., Reynolds) and closed his complaint. See id. at ¶ 60. Although Reynolds later withdrew as Manning's supervisor, Manning does not causally link Reynold's withdrawal to his protected conduct and Reynold's appointment as his supervisor. See id. at ¶¶ 60, 66.

On January 28, 2022, Manning met with Baer to discuss his issues with Yingling. In response, Baer assigned Manning a private office. See id. at ¶ 63. Even if this assignment constituted an adverse action (and it is hard to see how it is), Manning does not causally link this decision to his protected activity.

On April 11, 2022, Manning filed an EEOC charge. See id. at ¶ 19. Manning does not plausibly allege a causal connection between this protected conduct and any adverse action. See id. at ¶¶ 64–67. Accordingly, Manning has failed to plausibly allege his Title II retaliation claim under the ADA, and the court dismisses this claim.

E.

In count seven, Manning alleges tortious interference with contract against Yingling. See id. at ¶¶ 126–33. Under North Carolina law, tortious interference with a contractual relationship requires: (1) a valid contract between the plaintiff and a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract;

25

(4) the defendant acts without justification; and (5) actual damage to the plaintiff. Benjamin v. Sparks, 173 F. Supp. 3d 272, 289–90 (E.D.N.C. 2016), aff'd, 986 F.3d 332 (4th Cir. 2021); see United Lab'ys. Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). Acts of non-outsiders "are presumed to have been done in the interest of the [c]orporation" and are therefore "justified." Embree Constr. Grp., Inc. v. Ranfcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (quotation omitted). Any party that has a "legitimate business interest . . . in the subject matter" is a "non-outsider." Smith v. Ford Motor Co., 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). Thus, tortious interference claims against non-outsiders generally fail because plaintiffs cannot satisfy the tort's fourth element. See Embree, 330 N.C. at 498–99, 411 S.E.2d at 924–25; Wilson v. McClenny, 262 N.C. 121, 133, 136 S.E.2d 569, 578 (1964); Privette v. Univ. of N.C. Chapel Hill, 96 N.C. App. 124, 134–35, 385 S.E.2d 185, 191 (1989).

A plaintiff can overcome this presumption by showing that the non-outsider took the action for an improper reason. See Embree, 330 N.C. at 498, 411 S.E.2d at 924; Stec v. Fuzion Inv. Cap., LLC, No. 11-CVS-4241, 2012 WL 1524487, at *8 (N.C. Super. Apr. 30, 2012) (unpublished). To do so, a plaintiff must show that the defendant acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." Sellers v. Morton, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008); Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999). Merely alleging an improper actual or primary motive, however, will not suffice. Instead, the "complaint must admit of no motive for interference other than malice." Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007); see Filmar Racing, Inc. v. Stewart, 141 N.C. App. 668, 674–75, 541 S.E.2d 733, 738 (2001); Privette, 96 N.C. App. at 135, 385 S.E.2d at 191; see also Welch-Walker v. Guilford Cnty. Bd. Educ., No.

1:12-CV-149, 2014 WL 6997596, at *7, n.5 (M.D.N.C. Dec. 10, 2014) (unpublished); Jones v. Am. Airlines Inc., No. 5:08-CV-236, 2008 WL 9411160, at *5 (E.D.N.C. Oct. 16, 2008) (unpublished).

The court assumes without deciding that a "current student in good standing who is paying [his] tuition and other fees [has] a contractual right to return to school, nothing else appearing." Rouse v. Duke Univ., 869 F. Supp. 2d 674, 683 (M.D.N.C. 2012); see Dickinson v. Univ. of N.C., 91 F. Supp. 3d 755, 770 (M.D.N.C. 2015); Ryan v. Univ. of N.C. Hosps., 128 N.C. App. 300, 303, 494 S.E.2d 789, 791 (1998). Dismissal from an extracurricular university activity, however, does not create a breach of the underlying contractual right earn a degree. See Giuliani v. Duke Univ., No. 1:08CV502, 2009 WL 1408869, at *1–4 (M.D.N.C. May 19, 2009) (unpublished) (holding that dismissal from the golf team is not a secret expulsion from the university creating a breach of contract).

Manning alleges that State and Manning had a contract that Manning would obtain a doctorate in Materials Science and Engineering from State, and Yingling was aware of this contract. See id. at ¶¶ 127–28. Manning also alleges that Yingling interfered with this contract by refusing to allow Manning to fill an open GRA position so that he could obtain his doctorate degree. See id. at ¶ 128.

The court rejects Manning's argument. A GRA position makes it easier and more convenient to research a dissertation topic but is not necessary or sufficient to receive a doctorate. See id. at ¶¶ 32, 44. Moreover, Manning has not plausibly alleged that State will not allow him to continue his education towards a doctorate. In fact, Manning keeps requesting leaves of absence, not State. See id. at ¶¶ 66–67, 131. Even viewing count seven in the light most favorable to Manning, he fails to state a tortious interference with contract claim against Yingling. Thus, the court dismisses this claim.

## IV.

In sum, the court DISMISSES AS MOOT defendant State's motion to dismiss [D.E. 9] and GRANTS defendants' motion to dismiss [D.E. 19]. The court DISMISSES WITHOUT PREJUDICE plaintiff's amended complaint.

SO ORDERED. This 19 day of March, 2024.

JAMES C. DEVER III
United States District Judge

28